IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BYRON RAMON STEWART,

                             Petitioner,                            OPINION and ORDER

    v.

                                                      18-cv-185-jdp

GARY BOUGHTON,

                             Respondent.

---

Pro se petitioner Byron Ramon Stewart, a state prisoner incarcerated at Wisconsin Secure Program Facility, was convicted of first-degree intentional homicide. Both Stewart and another man, Thomas Conner, had been charged for the killing under Wisconsin's party-to-a-crime statute. Stewart and Conner each testified at Stewart's trial that the other had shot the victim. Stewart now seeks a writ of habeas corpus under 28 U.S.C. § 2254. The petition is briefed and ready for decision.

In his petition, Stewart raises numerous grounds that he contends warrant relief. The most serious is that his trial counsel was deficient for failing to investigate an exculpatory witness who said that Conner had admitted to shooting the victim and for failing to adequately investigate Conner's prior convictions. But to prevail, Stewart must do more than show that his trial counsel committed an error; he must also show that without the error, there was a reasonable likelihood of a different result at trial. Stewart's testimony was inconsistent with the rest of the evidence presented at trial, so I conclude that any errors he has identified were not significant enough to affect the outcome of his trial. I will deny his petition.

BACKGROUND

The following facts are taken from Stewart's petition and the state-court records provided by Stewart and the state.

**A. Trial and sentencing**

In April 2007, Stewart and Conner were arrested after fleeing from the scene of a shooting where Carlos Lak was killed. Both Stewart and Conner were charged in state court with first-degree intentional homicide as parties to the crime. Stewart was represented before and during trial by attorney Walter Isaacson.

Because Stewart was charged with a felony, Wisconsin law entitled him to a preliminary hearing to determine whether there was probable cause to believe that he committed the felony. *See, e.g.*, *State v. O'Brien*, 2014 WI 54, ¶ 19, 354 Wis. 2d 753, 850 N.W.2d 8. The state called two witnesses at Stewart's preliminary hearing. The first was Conner, who invoked his right against self-incrimination under the Fifth Amendment to the United States Constitution. The second was detective John Fahrney, who testified over Stewart's objection that Conner had made prior out-of-court statements that incriminated Stewart. Based on Fahrney's testimony, the court found probable cause and bound Stewart over for trial.

At trial, Stewart testified that Conner had shot Lak because of an argument about money. Conner no longer invoked his Fifth Amendment rights; instead, he testified that Stewart was the shooter. He also testified that he hadn't been promised anything in exchange for his testimony. Fahrney also testified, during which he said that Stewart had stopped talking to him after being arrested. Stewart moved for a mistrial, contending that Fahrney's testimony violated his Fifth Amendment rights, but the court denied the motion.

The jury found Stewart guilty of the homicide charge as well as other lesser offenses that Stewart didn't challenge at trial and doesn't challenge now. The judge sentenced Stewart to life imprisonment without the possibility of parole. After the trial, the state dismissed the homicide charge against Conner.

## B.  Postconviction motion and direct appeal

Attorney Joseph Sommers represented Stewart in postconviction proceedings and on direct appeal. Stewart filed a motion for postconviction relief under Wis. Stat. § 974.02, contending that he was entitled to a new trial for two reasons: (1) the state had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose an agreement with Conner regarding his testimony; and (2) the state's dismissal of the homicide charge against Conner was newly discovered evidence that established a reasonable probability of a different result at trial. Dkt. 15-12. The circuit court denied the motion. Stewart then raised these issues on direct appeal, and the Wisconsin Court of Appeals rejected Stewart's arguments, affirming his conviction. The Wisconsin Supreme Court denied Stewart's petition for review.

## C.  Further state-court proceedings

Stewart filed a pro se petition in the Wisconsin Court of Appeals for habeas relief under *State v. Knight*, 168 Wis. 2d 509, 484 N.W.2d 540 (1992). Dkt. 15-21. He contended that his appellate counsel was ineffective for failing to raise two issues on direct appeal: (1) Fahrney's testimony at the preliminary hearing about Conner's out-of-court statements that incriminated Stewart; and (2) Fahrney's testimony at trial that Stewart had invoked his right against self-incrimination during his arrest. The court of appeals rejected Stewart's *Knight* petition, and the Wisconsin Supreme Court denied his petition for review.

While his *Knight* petition was pending in the court of appeals, Stewart filed a pro se motion in circuit court for postconviction relief under Wis. Stat. § 974.06. Dkt. 15-27. In that motion, he said that his trial counsel was ineffective for four reasons: (1) failing to investigate an exculpatory witness; (2) failing to object to the trial judge's bias against Stewart; (3) failing to investigate Conner's prior convictions before trial; and (4) failing to object to improper statements in the prosecution's closing argument. He also contended that his postconviction counsel was ineffective for three reasons: (1) failing to challenge the effectiveness of his trial counsel on several points; (2) failing to raise issues relating to the prosecution's disclosure of Conner's prior convictions; and (3) failing to challenge the circuit court's party-to-a-crime jury instructions. And he contended that the state had committed a *Brady* violation by failing to disclose Conner's prior convictions. The trial court denied the petition, the denial was affirmed on appeal, and the Wisconsin Supreme Court denied Stewart's petition for review.

Stewart filed this § 2254 petition for federal habeas relief on February 20, 2018.

ANALYSIS

Stewart raises 11 grounds for relief in his petition, some of which include subparts. In reviewing his petition under Rule 4 of the Rules Governing Section 2254 Cases, I dismissed grounds 2 and 3, but I allowed Stewart to proceed on the other nine grounds. Dkt. 7. Stewart's remaining grounds include four groups of claims:

**Ineffective assistance of trial counsel:**

6. Trial counsel was ineffective because:

    a. he failed to investigate Conner's cousin, Arthur Conner, as an exculpatory witness.[1]

    b. he failed to raise judicial bias (see ground 10).

    c. he failed to investigate Conner's prior convictions before trial.

    d. he failed to object to the prosecutor's statements regarding Conner's credibility during closing arguments.

    e. he was generally incompetent, as shown by frequent procedural errors and comments from the trial judge.

**Ineffective assistance of postconviction counsel:**

7. Postconviction counsel was ineffective when he filed Stewart's § 974.02 motion because:

    a. he failed to raise claims that trial counsel was ineffective for failing to investigate Arthur (see ground 6a) and failing to object during closing arguments (see ground 6d).

    b. he failed to challenge the trial court's "party to a crime" jury instruction.

8. Postconviction counsel was ineffective when he filed Stewart's § 974.02 motion because he failed to raise a claim that trial counsel was ineffective for failing to investigate Conner's prior convictions (see ground 6c).

**Ineffective assistance of appellate counsel:**

5. Appellate counsel was ineffective because:

    a. he failed to raise Stewart's claim about the use of hearsay testimony at his preliminary hearing.

    b. he failed to raise Stewart's Fifth Amendment claim (see ground 4).

**Alleged pretrial, trial, and appellate errors:**

1. The state did not disclose an agreement to dismiss all charges against Thomas Conner in exchange for his testimony.

---

[1] I will refer to Arthur Conner as "Arthur" to avoid confusion with Thomas Conner.

4.  The court admitted evidence that Stewart invoked his Fifth Amendment right to remain silent.

9.  The state did not disclose Conner's prior convictions.

10. The trial judge was biased against him.

11. The Wisconsin Court of Appeals denied him his right of appeal.

I may grant habeas relief on the grounds identified by Stewart only if he demonstrates that he is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In deciding whether Stewart has made this showing, I look to "the last reasoned state-court decision" that addressed his claims. *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (internal quotation marks omitted). Stewart is in custody because of a state judgment, so § 2254(d) governs his petition. This section severely restricts my review of his state judgment, preventing me from granting relief unless the state court's adjudication of his claim

>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). After the state court has adjudicated Stewart's claims on their merits, I must be "highly deferential" to the state court's decision. *Davis v. Ayala*, 576 U.S. 257, 269 (2015). I may grant habeas relief only if Stewart shows that the state court's decision "was so lacking in justification that there was error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Several of Stewart's claims challenge the effectiveness of his trial, postconviction, or appellate counsel. Such claims are analyzed under the standard in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires Stewart to demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency, *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000). To demonstrate deficient performance, Stewart must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. To demonstrate actual prejudice, Stewart must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. For claims based on ineffective assistance of counsel that the state court has previously evaluated on the merits, my review must be "doubly deferential," deferring both to counsel's judgment and to the state court's decision. *Cullen v. Pinholster*, 563 U.S. 170, 189–90 (2011). The question is "whether there is any reasonable argument that [Stewart's] counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 89.

As a preliminary matter, I will address the state's contention that Stewart has abandoned several grounds by failing to address them in his initial brief. Stewart addressed several of these grounds at length in his petition, such as ground 1, for which he provided two paragraphs of explanation. Dkt. 1, at 4, 8. And the other grounds that the state contends were waived are closely related to grounds that Stewart discusses fully. For example, the state contends that he waived ground 10, in which he contends that the trial judge was biased against him. But he discusses the support for that ground fully in his discussion of ground 6b, in which he contends that his trial counsel was ineffective for failing to raise the issue. Dkt. 25, at 7–8. Stewart is a pro se petitioner entitled to some leeway, so I won't require Stewart to repeat

arguments that apply to multiple grounds. The parties have provided enough information for me to resolve all of Stewart's remaining grounds; I will not deem Stewart to have waived any of them.

## A. Ineffective assistance of trial counsel

Stewart contends in ground 6 of his petition that his trial counsel was ineffective for several reasons. He raised these issues for the first time in his pro se § 974.06 motion for postconviction relief, along with his claims in grounds 7 through 9, discussed separately below. The circuit court denied his motion. On appeal, the Wisconsin Court of Appeals concluded that Stewart had procedurally defaulted the claims because he hadn't shown a "sufficient reason" for failing to raise them in his § 974.02 postconviction motion. *State v. Stewart*, No. 2016AP529, slip op. at 4 (Wis. Ct. App. June 28, 2017) (quoting *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 517 N.W.2d 157, 163 (1994)).[2] Stewart contended that his reason for failing to raise them in his § 974.02 motion was that his postconviction counsel was ineffective, but the court of appeals rejected this argument because Stewart hadn't explained why these claims were "clearly stronger" than the claims that his postconviction counsel had chosen to pursue. *Id.* at 5 (quoting *State v. Romero-Georgana*, 2014 WI 83, ¶ 58, 360 Wis. 2d 522, 849 N.W.2d 668).

Stewart contends that the court of appeals erred by requiring him to expressly compare the strength of his claims to those raised by his postconviction counsel. He relies on *Walker v. Pollard*, No. 18-C-0147, 2019 WL 4219429 (E.D. Wis. Sept. 4, 2019), in which Judge Adelman criticized the Wisconsin Court of Appeals' conclusion that a habeas petitioner had procedurally defaulted his ineffective-assistance claims. In *Walker*, as in this case, the court of

---

[2] The opinion is at Dkt. 15-41.

appeals concluded that a habeas petitioner had procedurally defaulted his ineffective-assistance claim by failing to explicitly compare the claim he thought his counsel should have raised to the claims his counsel did raise. *Id.* at *4. If the court of appeals had rejected the petitioner's claim on an independent and adequate state ground, the court would have lacked power to hear the claim. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). But Judge Adelman concluded that the court of appeals' ruling on procedural default was not an independent and adequate state ground. He said that because the petitioner had clearly identified the factual and legal bases for his claim, the court of appeals simply needed to compare that claim to those raised by his postconviction counsel to determine whether the petitioner's claim was clearly stronger. *Id.* at *11. Because the court of appeals had applied state pleading rules in "an unexpected and freakish" manner, Judge Adelman concluded that the court of appeals' holding on procedural default didn't prevent him from considering the merits of the petitioner's claim. *Id.* at 11–12 (relying on *Prihoda v. McCaughtry*, 910 F.2d 1379, 1383 (7th Cir. 1990)).

Judge Adelman's reasoning in *Walker* is persuasive, and it directly applies to the court of appeals' holding that Stewart procedurally defaulted these claims. Like the petitioner in *Walker*, Stewart's brief to the court of appeals clearly laid out his claims, so all the court of appeals needed to do was compare them to the claims raised by his postconviction counsel—that the state had failed to disclose an agreement with Conner, and that the dismissal of the homicide charge against Conner was newly discovered evidence—and determine whether Stewart's claims were clearly stronger.

But even assuming that Stewart didn't procedurally default his claims, Stewart hasn't shown on the merits that his constitutional rights were violated. *Cf.* 28 U.S.C. § 2254(b)(2) (court may deny a habeas claim on its merits even if the claim wasn't exhausted). To determine

whether Isaacson's performance was deficient, I must consider whether it fell below an objective standard of reasonableness "under prevailing professional norms." *Strickland*, 466 U.S. at 688. If any of Isaacson's alleged errors constitute deficient performance, I must then consider whether the combined effect of Isaacson's deficiencies deprived Stewart of the effective assistance of counsel. *See Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) ("Rather than evaluating each error in isolation . . . the pattern of counsel's deficiencies must be considered in their totality."). Because no state court considered these claims on their merits, I will consider them de novo. *Stitts v. Wilson*, 713 F.3d 887, 895–86 (7th Cir. 2013).

**1. Deficient performance**

Stewart contends that his trial counsel, Isaacson, was ineffective for several reasons: (1) failing to investigate Conner's cousin, Arthur, as an exculpatory witness; (2) failing to object to the trial court's bias; (3) failing to adequately investigate Conner's prior convictions before trial; (4) failing to object to the prosecutor's statements during his closing argument regarding Conner's credibility; and (5) overall incompetence, as shown by the previous four reasons and other alleged errors.

**a. Exculpatory witness**

Before his trial, Stewart received a letter from Arthur in which Arthur said that Conner had admitted to shooting Lak. Although a scanned copy of the letter is attached to Stewart's § 974.06 petition, Dkt. 15-27, at 34–35, the copy is largely illegible. In its brief before the Wisconsin Court of Appeals opposing Stewart's § 974.06 motion, the state summarized the letter in this way:

> In the letter dated July 5, 2007, Arthur claimed that he bumped into Conner while both were in jail. Arthur alleged that he asked Conner about his pending charges, and Conner replied that he was not "going down for murder." Further, Arthur claimed that

Conner "bragged like he shot . . . [C.L.]" and that he "motioned with his hand as a gun and said I pop, pop, pop." Arthur told Stewart that he was reaching out to Stewart because he was "in a similar situation, facing life over someth[ing] that somebody else did, yet, they pointing the finger and telling the police I did that shit."

Dkt. 15-39, at 21 (citations omitted; alterations in original). Stewart says that he gave this letter to Isaacson, who said that he would send an investigator to speak with Arthur. Dkt. 25, at 6. Isaacson included Arthur in the list of potential witnesses he sent to the state, Dkt. 15-27, at 24, but he did not call Arthur as a witness at trial.

Stewart also submits two affidavits from Arthur. In the first, dated 2010, Arthur wrote that during their 2007 encounter, Conner told him "I am not going down for the rest of my life for murder." Dkt. 15-27, at 33. Arthur did not say in the 2010 affidavit that Conner admitted to shooting Lak. In the second, dated 2012, Arthur repeated the allegations in the 2010 affidavit, but he added the allegation that Conner admitted to shooting Lak and "motioned with his hand a make shift gun by extending his pointer finger and said, 'I pop, pop, pop.'" *Id.*, at 36. Arthur also said in the affidavit that he had written to Isaacson at Stewart's request before the trial, that Isaacson had never contacted him, and that he would have been willing to testify at Stewart's trial about Conner's statements. *Id.*

A criminal defendant's trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. A decision not to investigate a potential witness "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Id.* Nothing in the record contradicts Arthur's assertion that Isaacson failed to contact him. Of course, Isaacson may have investigated Arthur in other ways. But neither the trial court nor the court of appeals held an evidentiary hearing regarding the performance of

11

Stewart's trial counsel under *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). So there is nothing in the record stating whether Isaacson investigated Arthur at all.

If Isaacson decided not to investigate Arthur, the decision might have been reasonable if Arthur were merely one of several witnesses who were willing to testify that Conner had admitted to shooting Lak. But no other witness offered such testimony at trial; indeed, no witness other than Stewart offered testimony directly accusing Conner of the shooting. The state suggests that Arthur's testimony would have been inadmissible hearsay under Wisconsin law. But the testimony may have been admissible as a statement against Conner's interest under Wis. Stat. § 908.045(4). In any event, based on the record, I cannot determine what efforts, if any, Isaacson took to investigate Arthur and what reasons, if any, he might have had for failing to call him as a witness at trial. But because I conclude below that even if Isaacson failed to adequately investigate Arthur, Isaacson's performance wouldn't have prejudiced Stewart, I will assume without deciding that Isaacson's performance was deficient on this point.

**b. Trial court bias**

Stewart says that Isaacson erred by failing to object to what Stewart describes as judicial bias. He identifies three points at which he says that the trial court "usurped the functions of counsel during the trial" by serving as an advocate for the prosecution. Dkt. 1, at 18. The first occurred while Isaacson was questioning Conner about prior potentially inconsistent statements to Conner's parole officer regarding Stewart's marijuana use, when the court interrupted Isaacson's questioning to say that if Conner "doesn't remember saying anything, then it can't refresh or discredit his recollection. He says he doesn't remember." Dkt. 15-50, at 107.

The second occurred while the defense's DNA expert witness was testifying. The witness began to read verbatim from a lengthy PowerPoint presentation without questioning from Isaacson, describing her qualifications and her laboratory's accreditations. The court interjected to ask, "How can it be possible—apparently, the State is not objecting to this?", after which the prosecution said, "If I have an objection at some point, obviously, I will object." Dkt. 15-53, at 51–52. The court then allowed the witness to continue reading her presentation until she began to discuss the testing that she had performed for Stewart's case, at which point the prosecution objected to her narrative testimony.

The third occurred shortly after the second, outside the presence of the jury, concerning the prosecution's objection to the expert's testimony. The court explained that it would not allow the expert to read the remainder of her presentation verbatim because doing so could make it difficult for the prosecution to challenge the foundation of the witness's testimony. The parties then discussed whether the witness would be allowed to show the jury any of her remaining slides regarding the testing she had performed, with the court allowing her to present some slides and prohibiting her from presenting others. The court then asked the expert if she intended to use a particular slide explaining a phenomenon in DNA testing known as "stuttering." The witness said that she did, and the court asked the prosecution, "You are objecting to that?", to which the prosecution responded that it might. *Id.*, at 66–67.

These remarks show no significant bias, only basic courtroom management. In the first instance, the court interjected to prevent Isaacson from continuing to question Conner about an issue he could not recall. In the second instance, the court expressed reluctance to allow a witness to present narrative testimony, although the court ultimately allowed it. As the court later explained, it expected the prosecution to object to the witness reading her testimony in

13

this way because it might make it difficult for the prosecution to object on the grounds of foundation. *Id.* at 62. And in the third instance, the court merely asked the state to clarify whether its objection to the witness's use of the PowerPoint presentation would include a particular slide from the presentation. These statements do not "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible"; rather, they show nothing more than the "judge's ordinary efforts at courtroom administration," which are "immune" from charges of judicial bias. *Liteky v. United States*, 510 U.S. 540, 556 (1994). Isaacson's failure to object to these remarks wasn't deficient performance.

### c.  Prior convictions

Stewart contends that Isaacson erred by failing to adequately investigate Conner's prior convictions. Under Wisconsin law, before a witness may be asked about his prior convictions, the court must determine beforehand whether the evidence should be excluded. Wis. Stat. § 906.09(3). The witness may then be asked whether he has been convicted of a crime, and, if so, how many times. Wis. Stat. § 906.09(1). If the witness's answers to these questions are consistent with the court's determination, then the adverse party may not ask any further questions regarding the witness's prior convictions. *Id.*

The prosecution called Conner as a witness on the first day of trial. Before Conner testified, the counsel discussed Conner's prior convictions pursuant to § 906.09(3). Dkt. 15-50, at 35–36. The prosecution said that Conner had two prior convictions—one for resisting and obstructing an officer, and one for armed robbery. Isaacson offered no disagreement. Conner then testified that he had two prior convictions. *Id.* at 38.

In the middle of the third day of trial, after the state had rested its case, Isaacson told the court that Conner actually had five prior convictions in addition to the two that the

prosecution had disclosed. Dkt. 15-54, at 120–21. Isaacson said that he had noticed that morning that, along with the pending first-degree homicide charge for Lak's shooting, Conner also had a pending charge for marijuana possession as a second offense. *Id.* at 122. He had asked the prosecutor about Conner's first marijuana-possession offense earlier that day, but the prosecutor said that they hadn't found a certificate of conviction for a first offense. *Id.* Isaacson then sent his investigator to research Conner's prior convictions, and he told Isaacson that Conner had received five additional convictions between 1990 and 1994. *Id.* at 122–25. Isaacson argued that he should be able to introduce evidence of the additional convictions because the state had a duty to disclose them. But the trial court disagreed, reasoning that Isaacson also had "a duty to follow-up and double check [the prior convictions] before the damage was done." *Id.* at 124. So Isaacson was not allowed to question Conner about the additional convictions when he called Conner as a defense witness later that day.

Conner's testimony was central to the prosecution's case against Stewart, as he was the sole witness to testify that Stewart shot Lak. From the trial transcript, it appears that Isaacson didn't question the state's assertion that Conner had only two prior convictions or conduct an independent investigation of Conner's prior convictions until two days after Conner first testified. The fact that Conner had a pending charge for second-offense marijuana possession, coupled with the two unrelated convictions that the state had disclosed, should have alerted Isaacson that Conner had at least one additional prior conviction. There is a strong presumption that the decisions of counsel are based in trial strategy, but it is clear from the record that Isaacson's failure to investigate Conner's prior convictions was not a matter of conscious choice, but an oversight. Not every oversight amounts to deficient performance under *Strickland*. But Conner was the prosecution's star witness, so impeaching him was an

important aspect of the defense. I'll assume that Isaacson's failure to investigate Conner's prior convictions constitutes deficient performance.

### d. Prosecutor's statements

Stewart contends that his trial counsel was deficient by failing to object to the prosecutor's statements in his closing argument regarding Conner's credibility as a witness. Before summarizing Conner's testimony, the prosecutor said, "There was somebody who was completely credible, and that was Tom Conner." Dkt. 15-56, at 48. The prosecutor also said that Conner was credible based on his demeanor during his testimony: "Nobody gets up . . . and does those motions, acting out what they saw, unless they were there. You got to see it. You got to see the look in his eyes, and keep thinking, he was reliving the death of his friend, Carlos Lak." *Id.* at 50–51.

A prosecutor cannot personally vouch for a witness, but "[a] prosecutor may comment on the credibility of witnesses provided that comment derives from the evidence." *State v. Lammers*, 321 Wis. 2d 376, 773 N.W.2d 463, 470 (Ct. App. 2009). The prosecutor's comments regarding Conner's credibility were based on the evidence; he compared Conner's testimony to Conner's prior statements, photographs of the crime scene, testimony of other witnesses, and physical evidence. *See* Dkt. 15-56, at 48–58. And the prosecutor's comment about Conner's demeanor is also based on admissible evidence—Conner's demeanor as a witness. There was nothing improper in any of those comments for Isaacson to object to. Isaacson's failure to object to these statements wasn't deficient performance.

### e. General ineffectiveness

Stewart says that his trial counsel was generally ineffective for the previous four reasons as well as a handful of additional errors, none of which he describes in detail: presenting a

disorganized opening statement; improperly questioning the defense's DNA expert; and failing to turn over witness statements and a defense witness's address to the prosecution. *See* Dkt. 1, at 12. "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington*, 562 U.S. at 110 (internal quotation marks omitted). Stewart hasn't identified anything that makes these additional issues anything more than the type of garden-variety errors that are commonplace at trial, so I conclude that they do not show deficient performance.

### 2. Prejudice

Under *Strickland*, Stewart must show not only that Isaacson's performance was deficient; he must also show that he was prejudiced as a result of Isaacson's deficient performance. *Goodman*, 467 F.3d at 1029. To show prejudice, Stewart must show that there is a reasonable probability that without Isaacson's deficient performance, Stewart would have received a different result. *Strickland*, 466 U.S. at 694. Because no state court considered these claims on their merits, I consider them de novo.

I've assumed that Isaacson's performance was deficient because he failed to adequately investigate Conner's prior convictions and because he failed to investigate Stewart's cousin Arthur, who would have testified that Conner had admitted to shooting Lak. The next question is whether these putative errors prejudiced Stewart. In making this determination, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 112. Rather, Stewart must show that the likelihood that he would have received a different result is "substantial, not just conceivable." *Id.*

Stewart cannot make that showing here. Stewart's testimony was glaringly inconsistent with the forensic testimony about Lak's wounds, the testimony about ballistic evidence found at the crime scene, and the testimony of two eyewitnesses. So even if Arthur had testified about his conversation with Conner, and even if Conner had testified to having seven prior convictions instead of two, there is no reasonable likelihood that Stewart would have received a different result.

Stewart testified at trial that he saw Conner shoot Lak after a disagreement about money. Dkt. 15-55, at 18–106. According to Stewart, he took Conner to Lak's apartment to get money that Lak owed Conner. Lak let them in, and they entered the front door of the apartment into the living room, which contained a bed and a couch. While Conner and Lak argued about the money, Stewart stood by the front door. Conner and Lak began to wrestle. Conner overpowered Lak, throwing him onto the couch on his back. Conner placed his knee on Lak's chest and put his hand on Lak's throat. Stewart grabbed Conner by the shoulders to pull him off of Lak, then noticed that Conner had a pistol in his right hand. Conner fired twice, with the second shot coming a few seconds after the first. After the second shot, Stewart started to back away. He saw Lak slide off the couch onto the floor, after which Stewart left the apartment. While in the foyer, Stewart heard a third shot. He paused, then exited through the building's main door. Stewart walked to his car, got inside, and started it. When he started the car, he saw Conner in front of the car. Conner got in, and the two drove away.

Conner also testified about what happened. Dkt. 15-50, at 37–207. According to Conner, after he and Stewart arrived at Lak's apartment, Stewart asked whether Lak could obtain some cocaine. Lak made a call, then told Stewart that he didn't think that he could get any. Conner, who had his phone out at the time, looked down to put it back in his pocket.

When he looked up, he saw that Stewart had produced a gun, which he used to strike Lak in the face. Lak lost his balance and fell onto Conner, knocking Conner onto the armrest of the couch. Lak continued to fall toward the living room window and caught his balance by grabbing the blinds. Stewart then shot Lak in the head from a few inches away. Lak began to scream and spin in circles, and he moved into the open doorway between the living room and kitchen. Stewart then shot Lak again. Lak fell onto the kitchen table, then crawled toward the bed. He pulled the comforter off the bed, then fell over. Stewart took a pillow from the bed, put it over Lak's head, then shot him through the pillow. After shooting Lak, Stewart pushed Conner to the door with the gun and threatened to shoot him if he ran. Conner walked out the front door of Lak's apartment unit and toward Stewart's car with Stewart directly behind him. Conner entered the car on the passenger's side, after which Stewart entered on the driver's side.

Stewart's description of the shooting was inconsistent with forensic testimony about the gunshots that killed Lak. Michael Stier, an associate professor of forensic pathology at the University of Wisconsin-Madison, performed Lak's autopsy. At trial, he testified that Lak had received three gunshot wounds to his head: one that entered from the back of his head and remained in his skull; one that entered the back of his neck on the right side, then passed through; and one that entered the front of his face on the left side, then exited behind his left ear. Dkt. 15-52, at 57. In other words, Stier testified that Lak was shot once from the front, with the bullet passing through him, and twice from the back, with one of the two bullets passing through him and one remaining inside. But Stewart said that he saw Conner shoot Lak twice from the front—not once—while he had Lak pinned to the couch, after which Stewart left the room, then heard a third gunshot. So Stewart's testimony that Conner fired twice from the front wasn't credible.

19

Nor was Stewart's testimony consistent with the ballistic evidence from the crime scene. Both Conner and Stewart testified that three shots were fired. Although this number is consistent with the ballistic evidence, the consistency ends there. One bullet remained lodged inside Lak's head. Craig Johnson, a police officer who investigated the crime scene, testified that he found a bullet hole in Lak's kitchen window frame and a ricochet mark in a nearby driveway, suggesting that a second bullet had been fired from inside Lak's apartment, passed through the window frame, and ricocheted off the driveway. Dkt. 15-52, at 97–100. And Johnson testified that he found a third bullet lodged in the kitchen floor. *Id.*, at 115. Again, Stewart testified that Conner shot Lak twice from the front on the living-room couch. But according to Stier, the single shot that struck Lak from the front passed through him; no one testified that any bullets or bullet holes were found in or near the couch. And when Johnson described a photograph of the couch and the area around it for the jury, he didn't mention any bullet holes, *see id.* at 104–05, a fact that the prosecutor called attention to in his closing argument, Dkt. 15-56, at 36–37. So neither of the shots that Stewart described could account for the bullet from the shot to the back of Lak's head that remained in his head, the bullet that passed through the kitchen window frame, or the bullet that was lodged in the kitchen floor.

Finally, Stewart's testimony was inconsistent with the testimony of two eyewitness, Jacqueline McGlory and Brittany Marshall, who were at McGlory's house across the street from Lak's apartment. McGlory testified that after hearing gunshots, she saw two men who matched Stewart's and Conner's descriptions casually walk to a car and enter it. Dkt. 15-54, at 136–37. Likewise, Marshall testified that she saw "two men [come] out of the house." Dkt. 15-51, at 18. These statements were consistent with Conner's testimony that he and Stewart were together when they left the building, approached the car, and entered the car. But Stewart

testified that he left the apartment while Conner was shooting Lak, then entered his car and started it. He said that he saw Conner approach his car to enter only after he had started the car, which is inconsistent with McGlory's and Marshall's testimony that the two men were walking together.

Because Stewart's testimony was so inconsistent with the other evidence, I conclude that there isn't a reasonable likelihood that he would have received a different result if Conner had testified that he had seven prior convictions instead of two or if Arthur had testified about his conversation with Conner. Regarding Conner's prior convictions, even if Isaacson had discovered them earlier, the trial court could have excluded them under Wis. Stat. § 906.09(2), which allows the court to exclude evidence of a prior conviction if its probative value is outweighed by the danger of unfair prejudice. The statute lists several relevant factors, which include the time that has elapsed since the conviction. The most recent of the additional convictions occurred in 1994, or 13 years before trial, which could well have been grounds to exclude all five convictions. And even if the judge hadn't excluded them, a few additional convictions would be unlikely to significantly change the jury's assessment of Conner, as the jury was already aware that he had multiple prior convictions.

Stewart's claim regarding Isaacson's failure to investigate Arthur is stronger. Testimony from Conner's own cousin that Conner had admitted to the shooting could certainly have strengthened Stewart's defense by undermining Conner's credibility. But Stewart's testimony was so clearly inconsistent with the rest of the evidence that it would have doomed his defense even if Arthur had testified about his conversation with Conner and even if Conner had testified to five additional prior convictions. So Isaacson's performance didn't prejudice Stewart at trial and doesn't warrant habeas relief.

21

**B.  Ineffective assistance of postconviction counsel**

In grounds 7 and 8 of his petition, Stewart says that his postconviction counsel was ineffective for failing to raise four claims of ineffective assistance of trial counsel when he filed Stewart's § 974.02 motion: (1) Isaacson's failure to investigate Arthur; (2) Isaacson's failure to object to the prosecution's comments about Conner's credibility during closing arguments; (3) Isaacson's failure to investigate Conner's prior convictions; and (4) Isaacson's failure to challenge the trial court's "party to a crime" jury instructions. Stewart raised these claims in his § 974.06 motion, and the court of appeals concluded that he had procedurally defaulted them, along with his claims for ineffective assistance of trial counsel discussed above.

As with Stewart's claims for ineffective assistance of trial counsel, even if he didn't procedurally default them, he hasn't shown that his constitutional rights were violated. I will consider these claims de novo, as no state court considered them on their merits.

I have already concluded that the ineffective assistance of trial counsel claims underlying the first three reasons don't warrant relief, so Stewart's postconviction counsel cannot be ineffective for failing to raise them. In his fourth reason, Stewart contends that the trial court erred by instructing the jury that "[a]ll 12 jurors do not have to agree on whether the defendant directly committed the crime, or aided and abetted the commission of the crime," Dkt. 15-56, at 20. The trial court issued this instruction because Stewart was charged with first-degree homicide under Wis. Stat. § 939.05, under which a person may be charged with the commission of a crime in one of three ways: directly committing it, intentionally aiding and abetting its commission, or being party to a conspiracy to commit it. The trial court's instruction was based on *Holland v. State*, 91 Wis. 2d 134, 280 N.W.2d 288, 292–93 (1979), in which the Wisconsin Supreme Court held that a jury's verdict must be unanimous only on

the ultimate question of guilt or innocence, not on "alternative ways or means in which the crime can be committed." The court held that because "the party to a crime statute does not create three separate and distinct offenses" but rather a single offense that could be committed in one of three manners, the jury didn't have to reach unanimity on the manner in which the defendant participated in the crime. *Id.* at 293; *see also State v. Badzinski*, 2014 WI 6, ¶ 28, 352 Wis. 2d 329, 843 N.W.2d 29 (same). Stewart doesn't identify any authority or argument that calls *Holland* into question, so he is not entitled to relief on this ground.

## C. Ineffective assistance of appellate counsel

In ground 5 of his petition, Stewart contends that his appellate counsel was ineffective for two reasons. First, he says that his appellate counsel should have raised the trial court's admission of evidence that Stewart invoked his Fifth Amendment right to remain silent. I conclude in the next section that Stewart's underlying Fifth Amendment claim fails on its merits, so his appellate counsel wasn't ineffective for failing to raise it.

Second, Stewart says that his appellate counsel should have raised the state's use of hearsay evidence at his preliminary hearing. Stewart raised this claim in his pro se *Knight* petition, and it was rejected on its merits by the court of appeals. So I must defer to the court of appeals' decision unless no fair-minded jurist could agree with it. *Harrington*, 562 U.S. at 103.

At Stewart's preliminary hearing, Detective Fahrney testified about Conner's prior out-of-court statements. The use of hearsay evidence at Stewart's preliminary hearing may have violated Wisconsin's evidentiary and criminal procedure laws that were in effect at the time, as hearsay evidence was inadmissible in preliminary hearings until the legislature enacted Wis. Stat. § 970.038 (after Stewart's conviction).

23

The court of appeals summarized Fahrney's testimony at the preliminary hearing in this way:

> Fahrney testified that he had overheard a conversation between Conner and Conner's parents in Conner's hospital room several days after the homicide. Fahrney testified he heard Conner tell his parents that Stewart and Conner went to the victim's apartment to purchase cocaine, but the victim said he did not have any; that Stewart then struck the victim in the jaw with a gun, and then shot the victim three times; and that Stewart and Conner then fled the scene in Stewart's car before crashing into a tree.

*State ex rel. Stewart v. Circuit Court for Rock Cty.*, No. 2012AP1290-W, slip op. at 3 (Wis. Ct. App. June 26, 2012).[3] At the hearing, the circuit court ruled that Fahrney's testimony about Conner's statements was admissible as a hearsay exception under Wis. Stat. § 908.045(4) because Conner's statements were "partly against interest and partly trying to divert culpability elsewhere." Dkt. 15-48, at 15.

Stewart contends now that that the circuit court impermissibly considered Conner's statements to his parents as a whole instead of considering whether each individual remark was against Conner's interest, and that his appellate counsel was ineffective for failing to raise this claim. *See Williamson v. United States*, 512 U.S. 594, 599 (1994) (statement-against-interest hearsay exception applies to individual declarations or remarks, not to extended narrative containing some statements against interest).

The court of appeals said that Stewart had failed to show ineffective assistance of appellate counsel because this claim wasn't "clearly stronger than the issues appellate counsel raised on appeal." *Stewart*, No. 2012AP1290-W, slip op. at 2. The court relied on *Smith v.*

---

[3] The opinion is at Dkt. 15-22.

*Robbins*, 528 U.S. 259, 288 (2000), for this proposition—specifically, the Supreme Court's quotation of *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986), in which the Court of Appeals for the Seventh Circuit said, "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." The Wisconsin Court of Appeals concluded that this claim wasn't clearly stronger than the two claims raised by Stewart's appellate counsel: (1) that the state violated *Brady* by failing to disclose an alleged plea agreement with Conner; and (2) that the dismissal of charges against Conner was newly discovered evidence that would entitle Stewart to a new trial. The court of appeals also approved of the trial court's reasoning at the hearing that "Conner's statements that he went with Stewart to the victim's apartment, witnessed Stewart shoot the victim, and then fled with Stewart in Stewart's car did not necessarily indicate that Conner was an innocent bystander" and that the statement-against-interest exception thus applied. *Stewart*, No. 2012AP1290-W, slip op. at 5. And it noted that even if Stewart's appellate counsel succeeded in showing that the statement-against-interest exception didn't apply, he would still have to show that the residual hearsay exception didn't apply because Conner's "statements bore other indicia of reliability—namely, that Conner was a patient in a hospital and speaking to his parents when he reported the details of the shooting." *Id.*

Stewart doesn't address the court of appeals' reasoning in his petition or his briefing, and the court of appeals' reasoning regarding the statement-against-interest exception is sound. (I need not address the more questionable analysis of the residual hearsay exception.) As the court of appeals noted, the trial court considered Conner's statement piece-by-piece, rather than as a whole. And the prosecution presented its argument at the preliminary hearing based on Conner's individual statements:

> We have testimony against interest that [Conner and Stewart] went to [Lak's apartment] to purchase cocaine. . . . Certainly he also indicated that he fled with the shooter in a homicide; that he left with that individual. Again indicating culpability on his part. So the statements that were made were all against his interest, and we would ask the Court to allow the statements into the record.

Dkt. 15-48, at 13–14. With the state framing the issue for the circuit court in this way, addressing each individual statement, it is reasonable to infer that the circuit court considered each statement individually. If so, when the circuit court said that Conner's "statement is partly against interest and partly trying to divert culpability elsewhere," *id.* at 15, it wouldn't have meant that all of the statements were admissible even though some of Conner's individual statements were against interest and some were intended to shift the blame to Stewart. Rather, it would have meant that *all* of his statements were against his interest because they exposed him to criminal liability, even though they also placed the blame for the homicide on Stewart. The court of appeals reasonably concluded that Stewarts' hearsay argument lacked merit, and it reasonably concluded that the claim was not clearly stronger than those raised by Stewart's appellate counsel.

Stewart contends, again relying on *Walker,* 2019 WL 4219429, that the Wisconsin Court of Appeals impermissibly added a third element to the *Strickland* test by requiring him to show that this claim was "clearly stronger" than those raised by his appellate counsel. In *Walker,* Judge Adelman considered a hypothetical case in which the trial court committed two serious constitutional errors to which trial counsel objected. He observed that even if appellate counsel were to raise only one serious error, appellate counsel's performance could nevertheless be deficient for failing to raise the second error even though it was not clearly stronger than the first issue. *Id.* at *16.

26

Judge Adelman's point is well-taken, but it doesn't directly apply to Stewart's claim. *Walker* illustrates that the "clearly stronger" test, applied properly, is really just another way of asking whether appellate counsel's performance was actually deficient, or just a matter of strategy. As Judge Adelman observed, "counsel does not have an obligation to raise every nonfrivolous issue on appeal." *Id.* In other words, *Walker*'s reasoning applies to an unraised claim that is so strong that it "would have been raised by any reasonably competent attorney regardless of the strength of the other issues." *Id.* Stewart's argument that Fahrney's testimony at the hearing contained inadmissible hearsay is at least arguable, but it is not nearly so strong that "no rational jurist could conclude that counsel's failure to raise [it] was objectively reasonable," *id.*

In any event, any constitutional deficiency in the trial court's probable-cause determination is mooted by the jury's determination that Stewart committed the crime. *See United States v. Rosario*, 234 F.3d 347, 352 (7th Cir. 2000) (any error in presenting evidence to grand jury "would be harmless given the jury conviction at trial which indicates a proper grand jury proceeding would have still yielded an indictment"). So even if I were considering the issue de novo, without deference to the court of appeals' reasoning, I would conclude that appellate counsel's failure to raise the hearsay issue does not demonstrate any deficient performance. Stewart is not entitled to relief on this ground.

## D. Alleged pretrial, trial, and appellate errors

### 1. Alleged plea agreement with Conner

Stewart contends in ground 1 of his petition that the state committed a *Brady* violation by failing to disclose an alleged agreement with Conner for his trial testimony. Stewart exhausted this claim on direct appeal. The Wisconsin Court of Appeals was the last court to

issue a reasoned opinion on this claim, *State v. Stewart*, No. 2009AP3139-CR, 2010 WL 4238682 (Wis. Ct. App. Oct. 28, 2010), so I must review its opinion deferentially.

The court of appeals noted that under Wisconsin law, the existence of a plea agreement is generally a question of fact, and that "the circuit court is the ultimate arbiter of the credibility of witnesses." *Id.* at *2–3 (citing *State v. Quarzenski*, 2007 WI App 212, ¶ 19, 305 Wis. 2d 525, 739 N.W.2d 844; *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979)). The court of appeals declined to reconsider the circuit court's conclusion that there was no agreement between Conner and the state. The circuit court's conclusion was based on the testimony of three witnesses who testified at a posttrial hearing, which the court of appeals summarized as follows:

> (1) Conner testified that he did not have an agreement with the State, and that he testified at Stewart's trial to tell the truth;
>
> (2) Conner's attorney testified that Conner did not have an agreement with the State, and that his reasoning in rescheduling Conner's trial [to occur after Stewart's] was that he wanted Conner to have the opportunity to testify before they determined whether it would be better to go to trial in Conner's case; and
>
> (3) the prosecutor testified that Conner did not have an agreement with the State, that the State determined after Conner testified at Stewart's trial that the State would not be able to prove Conner's guilt beyond a reasonable doubt, and that the State was ethically required to dismiss the first-degree intentional homicide charge against Conner in the interest of justice.

*Id.* at *3.

Stewart doesn't directly attack the court of appeals' decision or address its reasoning in any way; he simply contends that there must have been an understanding of some type between

Conner and the state that he would be rewarded for testifying against Stewart because the state dropped the homicide charge against Conner after Stewart's conviction.

Under § 2254(d), Stewart must show more than that the circuit court could have reasonably reached a different conclusion; he must show either that the court of appeals' decision involved either a clear legal error or an unreasonable factual determination. He identifies no legal error, and the factual determination he challenges—that there was no agreement—was not unreasonable. That determination was based on three witnesses' testimony that there was no agreement. The circuit court found that testimony credible, and the court of appeals correctly deferred to the circuit court's credibility determination. Stewart is not entitled to relief on this ground.

### 2. Right against self-incrimination

Stewart contends in ground 4 that his Fifth Amendment right against self-incrimination was violated when Detective Fahrney testified at trial that Stewart had declined to speak to him. Stewart didn't raise his Fifth Amendment claim on direct appeal, but in his *Knight* petition, he raised the claim that his appellate counsel was ineffective for failing to raise the Fifth Amendment claim. As I noted in an earlier order, Stewart would normally therefore be barred from raising the underlying Fifth Amendment claim in his § 2254 petition. Dkt. 7, at 9. But I noted that Stewart might be able to raise his Fifth Amendment claim in this court if he had raised the ineffective assistance of counsel claim as a means for the state court to reach his underlying Fifth Amendment claim. *Id.* If Stewart presented his Fifth Amendment claim to the state court as only an example of his trial counsel's failures, he would have procedurally defaulted the claim by failing to fairly present it for review. *Malone v. Walls*, 538 F.3d 744, 755 (7th Cir. 2008). But if his presentation of the ineffective-assistance claim also included the

operative facts and the controlling legal principles regarding the Fifth Amendment claim, then he fairly presented both claims for state-court review. *Id.* at 753.

Now, after full briefing of the petition, I conclude that Stewart fairly presented his underlying Fifth Amendment claim. His *Knight* petition fully laid out the grounds for the claim. *See* Dkt. 15-21, at 11–14. His presentation of the issue allowed the court of appeals to discuss the merits of his Fifth Amendment claim in denying his ineffective assistance claim for his appellate counsel's failure to raise the Fifth Amendment claim. *See Stewart*, No. 2012AP1290-W, slip op. at 6–7. And Stewart likewise fairly presented the substance of his Fifth Amendment claim in his petition for review to the Wisconsin Supreme Court. *See* Dkt. 15-25, at 12–15. So Stewart didn't procedurally default his Fifth Amendment claim, and I will consider it on its merits. Because the court of appeals didn't consider the underlying claim on its merits, I will consider the claim de novo.

At Stewart's trial, the state asked Detective Fahrney to describe his first conversation with Stewart. Fahrney testified,

> I talked to him on the phone for probably less than a minute or two, from the time it took me to walk from Henry Avenue down to the house [to which Stewart had fled after the shooting, and from which he had called the police]. And then he came out and was taken into custody. I had small talk with him while we went to the police department, and then at the police department attempted to have a conversation with him and he elected not to speak to us.

Dkt. 15-21, at 98–99. The trial court denied Stewart's counsel's request for a mistrial on Fifth Amendment grounds. *Id.* The trial court said, "I did not hear anything about the Fifth Amendment. All I heard was Mr. Stewart elected not to have any more conversation. . . . I think for purposes of completeness it just ends the conversation." *Id.* at 101. The trial court offered to provide a corrective instruction to the jury if Stewart's counsel wished but said that

it believed that such an instruction would likely do more harm than good by drawing attention to the testimony. *Id.* at 101–02.

The court of appeals didn't directly address Stewart's Fifth Amendment claim because he raised it only indirectly through his ineffective-assistance claim. But it concluded that Stewart hadn't shown that the ineffective-assistance claim was clearly stronger than those raised by his appellate counsel, so it denied his request for relief. Dkt. 15-22, at 6–7.

The prosecution may not use a criminal defendant's silence following *Miranda* warnings against him at trial. *Doyle v. Ohio*, 426 U.S. 610 (1976). But if the defendant's silence was mentioned at trial but "not used against him within the meaning of *Doyle*," his rights were not violated. *Greer v. Miller*, 483 U.S. 756, 764 n. 5 (1987). "A statement such as 'I told the suspect that he could remain silent, and he did' does not ask the jury to infer guilt from silence," so it does not violate the Fifth Amendment. *United States v. Higgins*, 75 F.3d 332, 333 (7th Cir. 1996). Fahrney offered precisely this type of testimony, and Stewart doesn't identify any other point in the trial at which the prosecution drew attention to his silence. Stewart is not entitled to relief on this ground.

### 3.  Failure to disclose Conner's prior convictions

In ground 9 of his petition, Stewart contends that the state committed a *Brady* violation by failing to disclose all of Conner's prior convictions. As addressed above, the court of appeals concluded that Stewart procedurally defaulted this claim, along with his claims in grounds 6 through 8, so it didn't address the claim on its merits. But even if Stewart didn't procedurally default this claim, it fails on its merits on a de novo review. To show that he is entitled to habeas relief on this ground, he must show that the undisclosed information is material—in other words, he must show that if the state had disclosed the information, it would create a

reasonable probability that Stewart would have received a different result at trial. *Sims v. Hyatte*, 914 F.3d 1078, 1087 (7th Cir. 2019). I have already concluded that the information about Conner's additional convictions wouldn't have created a reasonable likelihood of a different result at trial, so Stewart is not entitled to relief on this ground.

### 4.  Trial court bias

Stewart contends in ground 10 of his petition that the trial judge was biased against him. Although Stewart challenged Isaacson's failure to object to the judge's supposed bias, as addressed above, it appears that Stewart did not raise judicial bias as a standalone claim at any time in state court. In any event, Stewart relies on the same judicial conduct underlying the ineffective-assistance claim that he raised in ground 6, and it fails here for the same reasons.

### 5.  Denial of right of appeal

In ground 11 of his petition, Stewart contends that the Wisconsin Court of Appeals denied him his right of appeal when it concluded that he had procedurally defaulted the claims that he raised in his § 974.06 petition. In my Rule 4 review of Stewart's petition, I noted that although it was unclear what Stewart intended to argue, it was conceivable that his due process rights may have been denied if the court of appeals had been truly biased against him. Dkt. 7, at 12. Stewart didn't raise this claim in any prior state-court proceeding, so I will review it de novo.

In his brief, Stewart contends that the court of appeals violated his due process rights because it decided his § 974.06 petition on a ground that it raised sua sponte—procedural default—without giving him the chance to address the issue. But the state directly raised this issue in its brief opposing Stewart's appeal, contending that Stewart had failed to explain why his current claims were clearly stronger than those raised by his postconviction counsel.

Dkt. 15-39, at 18–20. Stewart had the opportunity to address this argument in his reply brief, but he didn't. Dkt. 40, at 9–11. And even if the court of appeals had raised the issue sua sponte, I have already determined that the claims that the court of appeals rejected don't entitle Stewart to habeas relief. Stewart is not entitled to relief on this ground.

## CONCLUSION

Stewart challenges his conviction on many grounds, but he is entitled to relief on none of them.

Under Rule 11 of the Rules Governing Section 2254 Cases, I must issue or deny a certificate of appealability when entering a final order adverse to a petitioner. To obtain a certificate of appealability, the petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This means that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted). I conclude that reasonable jurists might debate whether Isaacson's trial performance prejudiced Stewart. Accordingly, a certificate will issue.

## ORDER

IT IS ORDERED that:

1. Petitioner Byron Ramon Stewart's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED.

2. A certificate of appealability shall issue.

3.  The clerk of court is directed to enter judgment accordingly and close this case.

Entered December 18, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge